DAVID E. GRAHAM, Respondent, *v.* CITY OF NEW YORK, Appellant, et al., Defendants.

First Department, November 16, 1967.

*Eric J. Byrne* of counsel (*Stanley Buchsbaum* with him on the brief; *J. Lee Rankin, Corporation Counsel*), for appellant.

*Murray L. Lewis* of counsel (*Joseph B. Castleman* with him on the brief; *Harry H. Lipsig*, attorney), for respondent.

CAPOZZOLI, J. The elements of an action for malicious prosecution are clearly specified in *Gastman* v. *Myer* (285 App. Div. 611). At page 612 the court said: "It is elementary that in order to make out a cause of action for malicious prosecution arising out of a criminal proceeding, plaintiff must allege and prove (1) that defendant instituted or continued a criminal proceeding against plaintiff; (2) malice; (3) absence of probable cause; (4) termination of the proceeding in favor of plaintiff; and (5) damages."

It is conceded by the defendant that the plaintiff was subjected to criminal prosecutions and that such prosecutions terminated in his favor. The only open questions, aside from damages, are whether there was no probable cause for his prosecutions and whether there was malice on the part of the defendant.

"Want of probable cause and malice are seldom established by direct evidence of an ulterior motive. They often rest upon circumstances such as the relation of the parties and the object sought or accomplished. Where malice or any improper or wrongful motive, or lack of probable cause exists it may be inferred that the act was malicious." (*Dean* v. *Kochendorfer*, 237 N. Y. 384, 389.)

"Probable cause is the knowledge of facts, actual or apparent, strong enough to justify a reasonable man in the belief that he has lawful grounds for prosecuting the defendant in the manner complained of. The want of probable cause does not mean the want of any cause, but the want of any reasonable cause, such as would persuade a man of ordinary care and prudence to believe in the truth of the charge. * * * Belief alone, however sincere, is not sufficient, for it must be founded on circumstances which make the belief reasonable." (*Burt* v. *Smith*, 181 N. Y. 1, 5–6.)

"If the apparent facts are such 'that a discreet and prudent person would be led to the belief that a crime has been committed by the person charged, he will be justified, although it turns out that he was deceived and the party accused was innocent.' * * *

"But where it is demonstrated that there is a dispute about either the true state of facts, or the inferences to be drawn by a reasonable person from the facts which led to the prosecution, the uniform rule has been to require there be a factual resolution at a trial." (*Munoz* v. *City of New York,* 18 N Y 2d 6, 10–11.)

The dissenting opinion argues that whether the police acted maliciously and without probable cause depends on whether Agramonte identified plaintiff as the seller. This is clearly not so, because the record is crystal clear that, while the lineup in which plaintiff was placed was held at the 45th Precinct in The Bronx, on July 10, 1958, at about 9 o'clock at night (R., p. 171), the plaintiff was actually placed under arrest at his home at about noon of the same day, many hours before the lineup was held. There can be no question about the fact that the plaintiff was arrested at that time. This appears to have been conceded at the trial by the Corporation Counsel, who said:

"Now, if a false arrest, or if an arrest of any kind took place at all, it must have taken place on the 10th of July.

"Now, on these facts it could be urged, and it would be urged, I would imagine, by the plaintiff, that the arrest of Graham took place some time in the early afternoon when the detectives went up to his house and brought him down for questioning at Broome Street. With respect to that it is the contention of the City that this was a detention which was altogether legal and appropriate * * * ". (R. 785.)

Sergeants Gleason and Kappes went to plaintiff's home and took him down to Police Headquarters Annex, on Broome Street. Before they left the plaintiff's home his gun and shield were taken away from him and he was never thereafter allowed to be out of the sight of the police who were connected with the investigation. In fact, on the way from Broome Street to the 45th Precinct, in The Bronx, where he was later formally booked, the plaintiff indicated to the officers who were accompanying him, that he was "going to run over and get some cigars". He was told by one of them "Oh, no, no, no, I'll go with you" and Sergeant Gleason went over with him to get the cigars. (R. 166–7.) Therefore, while it is true that he was formally booked on the 11th day of July, at 1:00 A.M., that does not alter the fact that he was actually arrested at his home as above indicated.

With reference to the identification by Agramonte, it is of the utmost importance to note that Agramonte testified time and time again at the trial and also in his examination before trial that he simply identified the plaintiff as one who had been in his gun shop on other occasions and with whom he had done some business and not as the one who had sold the stolen guns to him.

We are not unmindful of Agramonte's testimony before the Magistrate, on July 17, 1958, when the plaintiff was discharged, at the request of the District Attorney and the police, on the complaint charging him with theft of the guns from the Property Clerk. At that time Agramonte testified that he had been mistaken in his identification. But it must be remembered that none of this testimony was binding on the plaintiff at the time of the hearing before the Magistrate. As a matter of fact, the plaintiff's lawyer, who was present during the Magistrate's Court proceedings, for all practical purposes, was not permitted to interrogate Agramonte, nor Inspector Henning, who also testified. It was the position of the District Attorney and the presiding Magistrate that that court was not the forum for anything else that plaintiff's counsel had in mind. It was stated by the District Attorney that the purpose of putting Agramonte on the stand was to have the record disclose that a mistake of identity had been made by him so that a motion could be made for the dismissal of the complaint charging larceny from the Property Clerk's office. (R. 872–3.)

At the trial of the case at bar the Justice presiding permitted defense counsel to make use of the transcript of the Magistrate's Court in examining the witness, Agramonte, but he ruled that he was allowing it only for the purpose of weighing the credibility of Agramonte and that the statements made by him at the Magistrate's hearing were not binding upon the plaintiff or upon the plaintiff's cause of action. (R. 650–1.) This was obviously fair, because Graham's counsel was not allowed to take any part in the proceedings in the Magistrate's Court, and he was cut off from any examination of the witness. Under the circumstances it was clearly a question of fact as to whether the testimony of Agramonte, given at the trial, was to be believed, taking into account any fact which was brought out and which might affect his credibility.

In any event, the jury had to weigh the testimony of Agramonte at the trial and also his behavior at the 45th Precinct, in light of the fact that he was himself a suspect at the time of the lineup. Former Assistant District Attorney Farrell testified at the trial that his recollection of the events at the 45th Precinct, amongst other things, was " that Mr. Agramonte was there being charged with a crime or about to be charged with a crime because of certain guns that were found in his place of business ". (R. 703.) At the trial the court below, in part, charged the jury that it was to " consider whether Agramonte was under any coercion by virtue of possible involvement in the events at the time of his identification of the plaintiff in the lineup ". (R. 843.)

The defendant's argument, in its brief, that the identification of plaintiff by Agramonte, as a matter of law, constitutes probable cause is ill-founded. That would be so if Agramonte had been the victim of a crime perpetrated by the plaintiff. Under such circumstances the police officers would be bound to make an arrest upon the identification of the victim. However, we are not dealing with such a case. Agramonte was not a complainant against the plaintiff. He was used by the Police Department to bolster its case against the plaintiff who had been arrested long before the lineup identification.

In further judging the conduct of the police investigators it is important to remember that they knew that Graham had done business with Agramonte, using his true name, and that there were written records of that fact. There was no secret about it. It is hardly likely that Graham, whose real identity was known by Agramonte, would have sold stolen guns to him under an assumed name. They also knew that the real culprits, who had stolen the guns from the Property Clerk's office, while identifying themselves as being from the New York City Police Department, by showing their shields to Agramonte, signed false names and false shield numbers. One gave his address as 54 Arch Drive, Peekskill, and the other as 52 Arch Drive, Peekskill.

While at the 45th Precinct, and hours before the formal booking, a handwriting expert was called by the police investigators to compare the writing of the plaintiff with that of the real culprits. Plaintiff fully co-operated with the expert, giving many specimens of his handwriting. The result was that the expert then and there advised the police investigators that he could not say that the questioned documents were in Graham's handwriting.

Serious criticism is also justly due to the police for the manner in which they handled the search for the real culprits and their failure to delay the arrest of the plaintiff until the results of that search were in.

At R. 425 Inspector Henning testified: "we sent out a covering message to Peekskill to have it on record, and we sent out a message that said, was there any New York City policemen living at Arch Drive and, if so, who were they, and how long were they there and so forth."

At R. 482-3:

"Q. When did you send that alarm out? A. On the 11th, about the time of the booking.

"Q. Wait a minute. You got this information, according to your evidence, on the 10th. Didn't you send out an alarm on the 10th? A. No.

"Q. You went right through with the booking and mugging and everything else of Graham, is that right? A. That's right.

"Q. And you hadn't completed your inquiries in fact of Meade and Duggan, had you? A. Nope."

Before an answer was received, pursuant to this alarm, and without waiting for one, the plaintiff was formally booked on July 11, at 1:05 a.m. Inspector Henning was also asked (R. 425):

"Q. And when did you get the answer to that? A. Got the answer back on Saturday, July 12th.

"Q. And, of course, Graham had been booked at 1:05 a.m., on July 11th; is that correct? A. Yes."

Why did the police wait until the 11th to send out an alarm when a man was under arrest and he need not have been? Certainly the arrest of the plaintiff could have waited another day. Did not the jury have the right to consider this behavior on the part of the police authorities, together with all the other facts in the case, to determine whether there was probable cause for plaintiff's arrest? What particular reason made it necessary to arrest the plaintiff without completing all phases of the investigation? He was a member of the New York City Police Department since November 1, 1948, had an excellent background, was a member of the New York City Pistol Team and had never been in trouble with his superiors until this investigation started. He persistently denied any connection with the theft, both to the police and to Assistant District Attorney Farrell, who also questioned him. It is noteworthy that, at the trial, Mr. Farrell testified as follows (R. 705):

"Q. By the way, as a result of anything that happened in that police station that night, did you as the Assistant District Attorney, order the arrest of David Graham? A. I didn't order the arrest, no.

"Q. Did you make any request of the Police Department that they arrest David Graham? A. No I didn't."

There could have been no harm to anyone if the arrest of this plaintiff had been put off until the investigation was actually completed.

As to the charge placed against this plaintiff of receiving stolen property, a misdemeanor, it is significant to note that it was based upon an alleged theft of two guns from a Patrolman Kramer which, according to plaintiff's Exhibit 17 in the record, a Police Department document, were allegedly "lost or stolen" in 1954. (Emphasis supplied.) The record clearly shows that Kramer would not make any complaint and how the authorities expected to support this charge is beyond our understanding. Accordingly, the Grand Jury, quite properly, dismissed this

charge. Certainly it was not claimed that the plaintiff had actually stolen the guns. The only theory upon which a prosecution could have been based is one of possession of recently stolen property. Is it seriously contended that articles allegedly lost or stolen four years before this plaintiff's arrest, and found in his possession, come within the definition of a recent possession?

Add to this the further fact that, when the plaintiff ascertained that these guns really had belonged to a Patrolman Kramer, he then gave the investigators the name of Patrolman Greatbach as the one who had sold the two guns to him. He also explained that his failure to mention this last name earlier was because he did not wish to cause the patrolman any unnecessary difficulties. But he would not hold back this information when he ascertained that the guns belonged to Patrolman Kramer rather than Greatbach.

For the reasons above stated, questions of fact were properly submitted to the jury as to whether the defendant acted in the absence of probable cause and with malice in the prosecution of the plaintiff. The record discloses that these issues were decided against the defendant and the jury's determination is amply supported by the evidence and the law and, therefore, its verdict, as hereinafter modified, should be affirmed.

The amount awarded by the jury is grossly excessive in the light of the limited special damages shown at the trial and a verdict in excess of $15,000 is not warranted on this record. Accordingly, the judgment entered on July 6, 1965, in favor of plaintiff against defendant, City of New York, in the sum of $40,521.50 should be reversed, on the law and on the facts, with costs to defendant-appellant, the verdict vacated, and a new trial granted, unless plaintiff stipulates to accept $15,000 in lieu of the award by verdict, in which event the judgment should be modified to that extent and affirmed, as thus modified, with costs to defendant-appellant.

McNALLY, J. (concurring). The court is unanimous that the issue of probable cause is a jury question. The trial court properly put that issue to the jury in a comprehensive charge, to which no exceptions were taken and no requests were made. The jury's determination in that respect is amply supported by the evidence. However, the amount awarded by the jury is grossly excessive. A verdict in excess of $15,000 is not warranted on this record.

STEUER, J. (dissenting). In the late Spring of 1958, a substantial cash shortage was discovered in the Bronx office of the Police Department Property Clerk. A check revealed that sev-

eral guns were also missing. An investigation was ordered and an Inspector with a staff of 21 detectives was assigned to the job. The initial steps, simultaneously taken, were to make an audit of the office and to seek the thief who stole the money known to have been taken.

A patrolman named Jackson was quickly discovered to be the one who stole the money. He denied any participation in the theft of the guns and attributed that to another officer whose name was unknown to him but whom he described from having seen frequently in the Property Clerk's office. An officer named Sullivan, who was in charge of the Property Clerk's office, was interviewed, and he reported that the man described was undoubtedly Graham, the plaintiff in this action.

The same day, July 8, 1958, Graham was brought in for questioning. It immediately developed that Graham was a firearms enthusiast, a collector and an amateur gunsmith. He frequently conducted his activities in association with a building superintendent named Clark, who owned the required tools and was a skilled mechanic. They referred to themselves as Graham and Clark. At the time, Graham had several revolvers, pistols and rifles, and these were produced. He admitted that he frequented the Property Clerk's office for the purpose of checking the guns held there in order to make possible purchases when a gun was returned to the owner. He also admitted being on friendly terms with Sullivan, even to the extent that Sullivan allowed him to appropriate parts from guns in the office when Graham would need a part in his gunsmithing operation.

Undoubtedly the questioning officers believed Graham to be the thief and the questioning was severe. There is a sharp divergence in the accounts given by Graham and the officers called by the defendant. Graham's account was highly inflammatory and dramatically depicted an interrogation conducted in the grossest imaginable terms. While it was not characterized by violence or other physical pressure, as narrated by him it was so brutally unfair that it was impossible to listen to the account without a high degree of indignation. However, Graham's account, if dispassionately examined (a very difficult process) gives internal evidence of being exaggerated to a substantial degree. There can be little doubt that the narration inflamed the jury and resulted in the unwarranted size of the verdict.

On the same day, July 8, the audit of the Property Clerk's office was completed and the identifying numbers of the missing weapons became known. A check of the guns produced by

Graham showed that none of them corresponded with the stolen firearms. On the next day Graham was questioned before a stenographer as to the accounts he had already given as to his acquisition of the guns. His conduct showed the breach of a number of departmental regulations and, additionally, while none of the guns was the subject of the current investigation, two of them had some time before been reported to the department as being stolen. Graham admittedly lied in his answers as to how he had acquired these weapons. The purpose of this interrogation was merely to make a record of what he had already said.

On this day, July 9, a team of detectives interviewed all the licensed gun dealers in the city, but no trace of the missing weapons was found in their records. Up to this point no criminal charge had been lodged against Graham. On July 10 investigation of gun dealers was extended to the suburbs and in the books of the 15th dealer interviewed, Agramonte, Inc., in Yonkers, records of several of the missing guns were found. Two of the guns were still on the premises, and Edward Agramonte, the principal officer of the corporation, recalled the purchase and it appeared in some detail in his records. The relevant information was that the guns had been sold by two police officers who gave their names as "Meade and Duggan" and also their shield numbers and addresses. The last was given as 54 and 52 Arch Drive, Peekskill, New York. The detective making the discovery immediately telephoned Inspector Henning, who was conducting the investigation. A check of the records revealed that there were no police officers with those names and the badge numbers were false. A call to Peekskill unearthed that there was no street known as Arch Drive in that town. Upon ascertaining these facts, Inspector Henning told the detective to invite Agramonte to come to the station house. Agramonte accepted and, in a conversation with Henning, gave complete details of his recollection of the transaction. Meanwhile, Graham had been called to the station house. A lineup of eight police officers in civilian clothes, including Graham, was arranged. Agramonte picked Graham from the lineup. The testimony on this point will be discussed below.

Graham was immediately put under arrest and taken before a Magistrate. His counsel sought an adjournment and no proceedings on the charge were held. Graham was incarcerated. The next morning bail was supplied. In the course of the day the police received a telephone call from the Police Department of the Town of Shrub Oak. It seems that the case had aroused

the interest of various police departments in Westchester County and the Shrub Oak department reported that there was an Arch Drive in that town and that two New York City police officers resided on the street. Their names were ascertained. One was named Neid, which Agramonte had recorded as "Meade". He confessed to the theft of the guns. The police immediately informed the District Attorney and the attorney for Graham, who was brought before a Magistrate, and the District Attorney moved that the charge against Graham for larceny of the guns be dismissed. On the application Agramonte testified that Neid was the officer who sold him the guns and that when he identified Graham he was honestly mistaken. At the time he had believed Graham to be the seller, but when he confronted Neid, his error became apparent. The charge was dismissed.

It must be obvious that the crux of the question of whether the police acted maliciously and without probable cause depends on whether Agramonte identified Graham as the seller. There were many factors which made Graham a prime suspect—his frequenting the Property Clerk's office when he had no police business there during the sensitive period; his proclivities in respect to guns, plus his disregard for police regulations; and his established inclination to avoid the truth when it would interfere with this activity. Yet, these factors did not induce prosecution. It was only after the confrontation with Agramonte that prosecution followed. If Agramonte identified Graham as the seller, not only was there probable cause but it would have been an inexcusable dereliction of duty not to have prosecuted.

However, Agramonte's testimony at the trial differed materially from that he had given before the Magistrate on the occasion of Graham's discharge. At the trial he swore that he did not identify Graham as "Meade", the man who had sold him the guns, but as a person he had on prior occasions seen at his place of business. If that be true, no cause in addition to the suspicious circumstances noted above and which had not been felt to warrant prosecution, was shown.

We appreciate that which of Agramonte's stories is to be credited is the province of the jury as the trier of the facts. But where the evidence preponderates in favor of one version as against the other, it is the positive duty of the court to set aside a contrary verdict. And to allow an apparent injustice to result with the complacent reflection that it is a jury question, no matter how strongly the court feels the verdict should have

been otherwise, is to shirk that duty. It is in that light that Agramonte's two versions are examined.

It must be remembered that Agramonte was a defendant in the action. (At the close of the testimony the complaint against him was dismissed, but at the time he testified the suit against him was alive.) His first version of the identification was given *ante litem motam*, his second when he was seeking to escape liability. On cross-examination by the city he failed in any way to explain the discrepancy, maintaining an obvious impossibility, that both versions were correct. But when cross-examined by plaintiff in an effort to show that he could not have made an honest mistake, he stoutly maintained that he did. A mistake could only result if he had identified Graham as " Meade ", and there would have been no mistake if he had merely identified Graham as someone he had seen before.

Moreover, it is extremely doubtful whether Agramonte could have recognized Graham as a person he did business with before. While there are entries in Agramonte's books of earlier transactions, these are with Graham and Clark, and it is not clear which of the two, Graham or Clark, had them. Further, Agramonte had clerks and he did not deal with all his customers personally. And this is perfectly clear — Graham did not recognize Agramonte at the lineup and had no idea who he was until he was later told. While it is not conclusive, it is much more probable that had the two men met, Graham would have been the one to remember the meeting and to recognize the other; and the fact that he did not casts doubt on the fact that they ever did meet personally. As such, it is an additional reason for doubting Agramonte's substituted version of the identification incident.

For these reasons we believe the verdict to have been against the weight of the credible evidence. There is a further consideration that requires mention. If this verdict is to stand and to receive indorsement as a proper example of the legal process, there is no escaping the conclusion that Inspector Henning and Detectives Payne and O'Brien are guilty of the most serious misconduct that a police officer can commit in his official capacity.* This verdict is based on the fact that it is established by acceptable standards that these men deliberately misrepresented information obtained by them to justify an arrest and initiate a prosecution. If they did, their retention on the force

---

* These are the officers that are singled out by Graham's testimony. The others engaged in the investigation are either nameless or exonerated by Graham himself. Furthermore, there were two detectives named O'Brien, and the one exhibiting actual malice is not identified.

is intolerable. It would be cowardly and inconsistent for a Judge who so found to leave the matter without making the strongest representations to the Police Commissioner to exercise his powers to remedy the situation.

The verdict should be set aside and a new trial ordered.

RABIN and McNALLY, JJ., concur with CAPOZZOLI, J.; McNALLY, J., in memorandum in which RABIN, J., concurs; STEUER, J., dissents and votes to reverse and order a new trial in opinion in which EAGER, J. P., concurs.

Judgment, so far as appealed from, reversed, on the law and on the facts, with $50 costs and disbursements to the appellant, the verdict vacated, and a new trial granted, unless plaintiff, within 20 days after service upon him of a copy of the order entered herein, with notice of entry, stipulates to accept $15,000 in lieu of the award by verdict, in which event the judgment is modified to that extent, and, as so modified, affirmed, with $50 costs and disbursements to the appellant.